UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

* * * * * * * * * * * * * * *
CRAIG DAVIS, as parent and
natural guardian of
ANDREW DAVIS,
Plaintiff,

vs.                                    CIVIL ACTION
                                       No. 05-30011-MAP

CATAMOUNT DEVELOPMENT CORP.,
CATAMOUNT DEVELOPMENT CORP.
d/b/a CATAMOUNT SKI AREA,
Defendants.

* * * * * * * * * * * * * * *

**DEFENDANT CATAMOUNT DEVELOPMENT CORP.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF ACCIDENT SITE PHOTOGRAPHS**

    Now comes the defendant Catamount Development Corp. ("Catamount"), and opposes the plaintiff's motion. The defendant objects to the plaintiff's attempt to discover privileged material. As grounds for its opposition, the defendant states the following.

### Introduction

    This case involves a plaintiff who was injured when he skied off the skiable, groomed terrain at defendant's ski area. The plaintiff seeks to discover photographs which were all taken in anticipation of the instant litigation. Following the plaintiff's accident, the defendant took the following photographs:

1. Two (2) photographs taken by Ski Patrol Director Bud Gardner on the day of the accident;

2. Five (5) photographs taken by Richard Edwards approximately one week after the accident (referred to by Plaintiff as "**Category I**" photographs);

3. Twelve (12) photographs taken by Richard Edwards in May of 2004 ("**Category II**" photographs);

4. Five (5) photographs taken in March of 2005; and

5.  Six (6) photographs taken on March 24, 2006.

Plaintiff is moving to compel the photographs listed as (2) and (3) and which he has referred to as Category I and Category II photographs. We also anticipate that Plaintiff will seek disclosure of all of the foregoing photographs. This opposition addresses all of the photographs taken after the accident.

The two photographs taken by Bud Gardner on the date of the accident were taken in anticipation of the instant litigation. Catamount does not take photographs of accidents in the ordinary course of its business, and Mr. Gardner's purpose in taking the photographs was to obtain facts about the accident in the event that Catamount was sued. (See Gardner affidavit, paragraphs 1-9). Mr. Gardner's belief that Catamount was reasonable, as he observed the plaintiff's father become upset in the patrol room. (See Gardner affidavit, paragraph 8).

The remaining photographs were taken by Richard Edwards at the direction of William Gilbert (See Gilbert affidavit, paragraphs 7-15). Mr. Gilbert reasonably believed that a law suit would be filed as a result of the accident, as the plaintiff's father appeared upset when he visited Mr. Gilbert at Mr. Gilbert's office after the accident. (See Gilbert affidavit, paragraph 6). William Gilbert directed Richard Edwards to take the foregoing photographs listed because he believed that a civil action would be instituted against Catamount, and needed to obtain facts about the incident in the event that such a suit was filed. (See Gilbert affidavit, paragraphs 7, 8, 9, and 10.)

### Argument

### The Photographs Sought By Plaintiff Are Protected By the Work Product Doctrine and Are Not Subject to Disclosure

#### A. The Photographs Were Taken in Anticipation of the Instant Litigation

It is well established that documents prepared by a party in anticipation of litigation are protected under the work product doctrine. *Sham v. Hyannis House Hotel*, 118 F.R.D. 24, 25 (D.Mass 1987). The doctrine protects material that (1) is a document or tangible thing, (2) which was prepared in anticipation of litigation, and (3) which was prepared by or for a party, or by or for its representative. *Id.* "The pertinent test is: whether in light of the nature of the document and the factual situation in the particular case the document can fairly be said to have been prepared or obtained because of the prospect of litigation."

*Colonial Gas Co. v. Aetna Cas. & Sur. Co.*, 144 F.R.D. 600, 605 (D.Mass 1992).[1]

The photographs that the plaintiff seeks were created in anticipation of the instant litigation and satisfy the three prong test outlined above. Catamount does not take photographs after every accident that occurs on the premises. (See Gardner affidavit, paragraphs 3-5; see Gilbert affidavit, paragraphs 3-5). Charles Gardner, the head of the Ski Patrol at Catamount, took two photographs of the accident site on the day of the incident after he observed the plaintiff's father become upset about the plaintiff's accident in the patrol room. (See Gardner affidavit, paragraph 8).

Mr. Gilbert observed the plaintiff's father appearing upset when he visited Mr. Gilbert in Mr. Gilbert's office after the accident. (See Gilbert affidavit, paragraph 6). Subsequently, Richard Edwards, at the direction of Mr. Gilbert, took additional photographs. He took more photographs in May of 2004. (See Gilbert affidavit, paragraphs 7-8). Mr. Edward's actions were motivated by Catamount's need to obtain information about the incident in the event that the instant litigation would be filed. (See affidavit of William Gilbert, paragraphs 3-15).

### B. The Plaintiff Has Not Made Any Showing of Substantial Need of the Materials or Undue Hardship

Once the privilege is established, mere inconvenience or expense is not sufficient to show substantial need or hardship to overcome the privilege against disclosure. *Colonial Gas Company v. The Aetna Casualty & Surety Company*, 139 F.R.D. 269, 275 (1991). Undue hardship is "more than great convenience," and substantial equivalent "does not mean an exact duplicate." *Raffa*

---

[1] Rule 26(b)(3) of the Federal Rules of Civil Procedure provides that:

> ...a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusion, opinions or legal theories of an attorney or other representative of the party concerning the litigation.

*v. Gymnastics Learning Center, Inc.*, (2002 WL 389889) at *3. The plaintiff has no basis for asserting that there is a "substantial need" or "undue hardship" created by nondisclosure. He has his own pictures of the accident site which were taken by Elizabeth Dennis the day after the accident. (See Deposition of Craig Davis, page 67, line 14 attached hereto as Exhibit A; see Deposition of Elizabeth Dennis, page 27, lines 19-22, attached hereto as Exhibit B). In addition, the plaintiff had the opportunity to inspect, and did inspect, the accident site with his expert. At that time, the plaintiff's expert took additional photographs of the accident site.

The cases cited by the plaintiff are inapposite. In *Raffa v. Gymnastics Learning Center, Inc.*, (2002 WL 389889), a plaintiff was injured by a gymnastics device, and defendant took photographs of the device shortly after the plaintiff's accident. *Id.* at *1. Subsequently, the device was dismantled and disposed of. *Id.* at *4. The *Raffa* court focused on the unavailability of the equipment, and ordered disclosure of the photographs. *Id.* at *4. The court held that the substantial need and undue burden tests were met, because the device was disposed of and because it was impossible for plaintiff's counsel to take his own pictures of the equipment or to look at the equipment without the photographs. *Id.* at *4. In the instant matter, Plaintiff has taken multiple sets of photographs, and one set was taken the day after the accident. More photographs were taken by Plaintiff's expert. Further, Plaintiff has had a chance to view and inspect the alleged cause of injury, the accident site. Further, under *Raffa*, the plaintiff has not met the substantial need and undue hardship test. Further, under *Raffa*, "substantial need requires showing that an item plays an exceptionally important part in the preparation of the discoverer's case for trial," and the fact that the documents are merely "helpful" to the case is not sufficient. *Id.* at *2-*3.

In *Pasteris v. Robillard*, 121 F.R.D. 18 (D.Mass 1988), the court held that a statement taken by defendant's insurer was discoverable. In *Pasteris*, the court focused on the interest that the insurer had in settling the claim, and concluded that litigation could not have been reasonably anticipated. *Id.* at 21. Here, Catamount, and not its insurer, took the subject photographs, and, in contrast to the facts in *Pasteris*, was motivated by a belief that it would be sued.

Finally, the other case cited by plaintiff, *Papadakis v. CSX Transportation, Inc.*, 233 F.R.D. 227 (D.Mass 2006), does not apply to the instant facts. In *Papadakis*, the court ordered that the defendant produce surveillance tapes, not photographs. *Id.*

at 228-229. The court's decision to compel the production of the surveillance tapes was based on the unique probative value of surveillance tapes and noted that federal and state courts have uniformly required their disclosure. *Id.* at 228-229.

### Conclusion

For the foregoing reasons, defendant Catamount respectfully submits that the plaintiff's motion to compel and for sanctions should be denied.


Respectfully,
Defendant,
Catamount Development Corp.


By its attorneys,


/s/ William L. Keville, Jr.
William L. Keville, Jr.
BBO# 546525
Margaret M. Carleen
BBO # 655141
MELICK, PORTER & SHEA, LLP
28 State Street
Boston, MA 02109-1775
(617) 523-6200

## Page 65

1  Q. (By Mr. Keville) I'll ask it a different
2  way. Did Catamount have a practice, policy, or
3  procedure where its coaches were to report any
4  conditions that they felt would pose a hazard to --
5  A. No.
6  Q. As a race coach, were you concerned about
7  the safety of the members of your group?
8  MR. FERRIS: Objection to form.
9  A. I'm always concerned about the safety of
10 the members of my group.
11 Q. If you saw some condition at a ski area
12 that you felt posed a hazard to a member of the group
13 that you were coaching, would you have brought it to
14 the attention of someone at the ski area?
15 A. Probably.
16 Q. How did you learn of Andrew's accident?
17 A. I heard my -- Elizabeth scream.
18 Q. And where were you at that point?
19 A. I was about -- my recollection is I was
20 about 30 feet from Elizabeth on a trail called On
21 Stage.
22 Q. And where was Elizabeth?
23 A. She was about 30 feet uphill from me, is my
24 recollection.

## Page 66

1  Q. Was she on On Stage on the crossover or on
2  Catamount, do you recall?
3  A. She was on On Stage, not on the crossover;
4  we were already clearly on On Stage.
5  Q. What route did you take to get to the
6  location that you were at that day when you heard
7  Elizabeth scream?
8  A. I went down Catamount and then I had two
9  options crossing over to On Stage, and I'm not sure
10 which option I took. So I went down and I crossed
11 over onto On Stage.
12 Q. And what two options did you have to cross
13 over onto On Stage?
14 A. There is an area, a larger area, uphill of
15 a bush, or I could have taken an area below the bush,
16 and frequently I take the area below the bush because
17 a lot of skier traffic coming down these parts of the
18 mountain would cross over onto Catamount on that
19 upper portion, on that upper option. So I don't
20 recall what option I took that day.
21 Q. Just so I'm clear, I understand -- and
22 we'll be marking -- perhaps it already is marked.
23 Why don't we take a minute and let me look through
24 the exhibits that have been marked.

## Page 67

1  [Off record discussion]
2  MR. KEVILLE: Let's go back on the
3  record.
4  Q. (By Mr. Keville) Directing your attention
5  to what has been marked as Exhibit No. 12 for
6  identification, have you seen those photos before?
7  A. Yes.
8  Q. Did you take those photos?
9  A. I did not.
10 Q. Do you know who took them?
11 A. I believe Elizabeth Dennis took them,
12 mm-hmm.
13 Q. And do you know when she took them?
14 A. I believe these were taken the day after
15 the incident.
16 Q. And with respect to the photo which is
17 labeled with a B on Exhibit No. 12, so we're all
18 looking at the same one --
19 A. Yes, mm-hmm.
20 Q. -- you mentioned that there was an area
21 above the bush which was one possible way to cross
22 over from Catamount onto On Stage, correct?
23 A. Correct, mm-hmm.
24 Q. And then there is an area between the bush

## Page 68

1  and a fence, correct?
2  A. Right.
3  Q. Is that the second area which you mentioned
4  or is there an area below the --
5  A. No, that's the second option.
6  Q. So on that particular day, do you recall
7  one way or the other whether you had crossed over
8  from Catamount to On Stage above the bush or just
9  below the bush?
10 A. I said I don't recall.
11 Q. And was that your first run of the day?
12 A. I believe it was, but I'm not absolutely
13 certain.
14 Q. And you didn't see the accident happen?
15 A. That's correct.
16 Q. Were you skiing ahead of Andrew, with
17 Andrew, or behind Andrew?
18 A. I was not skiing with Andrew.
19 Q. Okay. Fair. You were with your group?
20 A. Mm-hmm. Yes.
21 Q. Do you know of anyone who crossed over from
22 Catamount to On Stage that day prior to Andrew who
23 did so between the bush and the fence?
24 A. Between the bush and the fence. I believe

25

1   MR. KEVILLE: I didn't even finish
2   my question.
3   MR. FERRIS: It seemed like it. You
4   said "Greater than five or less than five?"
5   Q. (By Mr. Keville) Had greater than two
6   skiers made it down besides yourself before Andrew?
7   A. I don't know.
8   Q. Did those skiers who did make it down
9   before Andrew, did they ski from Catamount to On
10  Stage?
11  A. Yes.
12  Q. Did they stop near you or somewhere else?
13  A. They would have had to have been below me.
14  Q. Did you observe those individuals make the
15  crossover from Catamount to On Stage?
16  A. Yes.
17  Q. What was your purpose in situating yourself
18  where you were at the time the students were making
19  their crossover?
20  A. I stopped at the top of On Stage because it
21  gave them an opportunity to warm up a little bit and
22  then it would give us a chance to ski together to the
23  next chair lift.
24  Q. Directing your attention to Exhibit No. 24,

26

1   can you point out to me with your finger where you
2   were situated at the time your group was making the
3   crossover?
4   A. I would say I was right about here.
5   MR. KEVILLE: Charles, would you
6   mind having this marked so we could at least
7   have her make an X at that point without
8   affecting the Exhibit No. 24?
9   MR. FERRIS: So you want to make
10  another copy of 24?
11  MR. KEVILLE: Just the portion -- I
12  don't need the whole -- I don't think we need
13  the whole thing. I'm just interested in the
14  trail system.
15  MR. FERRIS: Yeah.
16  (Exhibits 31 and 32, marked)
17  Q. (By Mr. Keville) I know this isn't to
18  scale, but if you can make a mark --
19  A. I would say about here.
20  Q. And you have marked on the exhibit, which
21  is No. 31, the general area where you were situated
22  on the On Stage trail as you watched your group make
23  the crossover from Catamount onto On Stage?
24  A. Yes.

27

1   Q. And is the area where you were situated
2   shown on any of the photos in what has been marked as
3   Exhibit No. 32?
4   A. Yes.
5   Q. If you want to draw a stick figure, if you
6   could, where you were. Or is an X easier?
7   A. Yeah. I would say about here.
8   And -- this one's harder.
9   Q. Why don't you circle -- you've made a mark
10  on Exhibit 32, the photograph, with an A next to the
11  lower left-hand corner, correct?
12  A. Yes.
13  Q. Okay, just circle that.
14  Now, looking at the same exhibit, No. 32,
15  directing your attention to photograph B, does that
16  show the crossover in the area where Andrew's
17  accident occurred?
18  A. Yes.
19  Q. And did you take those photos?
20  A. Yes.
21  Q. And when did you take those photos?
22  A. January 26, the day after Andrew fell.
23  Q. And how many photos did you take?
24  A. I don't know.

28

1   Q. What did you do with the photos that you
2   took?
3   A. Gave them to my parents.
4   Q. And do you have the negatives for those
5   photos or does someone else?
6   MR. FERRIS: Why don't we go off the
7   record for a second.
8   (Off record discussion)
9   (Exhibits 33 through 49, marked)
10  Q. (By Mr. Keville) It appears what has been
11  marked at Exhibits No. 33 through 49 are 17
12  photographs. I'll hand those to you. Are those the
13  photographs that you took on the -- I believe you
14  said it was the day following the accident?
15  A. Yes, these are the photographs.
16  MR. FERRIS: I just want to state
17  for the record that I believe that I've given
18  copies of these photos previously to counsel
19  for the defendant and we've been using copies
20  of them in the deposition, but I -- just in
21  case there's one or two that were not in that
22  group, we've remarked Exhibits 33 through to
23  49 which may, in fact, be duplicates of
24  photographs in Exhibits 7 through 16.