UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CRAIG DAVIS, as parent and natural guardian of ANDREW DAVIS,<br>        Plaintiff,<br> -against-<br><br>CATAMOUNT DEVELOPMENT CORP.,<br>CATAMOUNT DEVELOPMENT CORP,<br>d/b/a CATAMOUNT SKI AREA,<br>        Defendants. | CIVIL ACTION<br>No. 05-30011-MAP |

**STATEMENT OF FACTS**
**(INCLUDING MATERIAL FACTS THAT ARE DISPUTED)**

*Parties*

1. Andrew Davis is and was a resident of Connecticut at the time of his accident at Catamount Ski Area on January 25, 2004.

2. On the date of the accident Andrew was 7-years-old.

3. Craig Davis is Andrew's father and is the nominal plaintiff here.

4. Catamount Development Corp., the operator of Catamount Ski Area, is incorporated in New York State. (Answer, Third)

5. Catamount Ski Area's trails are located both in New York and Massachusetts. (Gilbert, Exhibit 9, at 60-62)

6. Catamount Ski Area understands it is obligated to comply with New York law by virtue of its location (*Id.* at 61).

*Race Program*

7. Andrew Davis had been skiing for several years prior to the accident, and on the date of the accident was participating in "Interclub", Catamount's junior level race training program where for a seasonal fee of $250 the participants learned to improve their skiing skills and turning skills (Adams, Exhibit 8 at 19-20; Craig Davis Aff. ¶3). The fee was waived as a fringe benefit to Craig Davis who was a

coach at Catamount Ski Area.

8. A more senior race program was also available at Catamount to more advanced skiers (*Id.*)

9. Andrew's skiing ability was described as "intermediate at least" by the director of racing (*Id. at 18*)

10. While in the program children often follow behind the coach practicing turns in the same manner as the coach, and often "follow the leader down the course" (*Id. at 20*; Schroeppel, Exhibit 7 at 22-23).

*The Accident*

11. While participating in his class on their first run of the day Andrew was instructed to ski from the top of "Catamount" Trail over to a point on "OnStage" Trail with a group of other students, behind the instructor, and to "work on making railroad track turns, " (Dennis, Exhibit 10 at 17) to "warm up a little bit". (*Id. at 22,25*).

12. There is a cross-over trail that connects Catamount and OnStage trails. On the right side of this trail was an orange mesh fence supported by wooden posts (Exhibits 20-36).

13. There was a bush on the right hand side of the cross-over trail but it was possible to ski across to OnStage by passing on either the left or right side of the bush (See e.g. Dennis, Exhibit 10 at 31). [Note: when skiing from Catamount Trail to OnStage Trail, the left side of the bush is "uphill" of the bush, and the right side is "downhill" of the bush]

14. The instructor did not recall if she told the students to go to the left or right side of the bush, or whether other members of the class skied on the left side or right side of the bush. (*Id. at 32-33*). Andrew recalled that the students in front of him skied on the right side of the bush, between the bush and the fence (A. Davis, Exhibit 2 at 32-34).

15. While participating in the turning drill, Andrew's right ski and leg was caught by a 2" x 4" fence post that was protruding on the trail on the right side of the bush, and leaning over at about a 45 degree angle (Exhibits 20-36) (A. Davis, Exhibit 2 at 30; C. Davis Aff. ¶5).

16. Andrew was skiing at an "average" speed (Dennis, Exhibit 10 at 35 ), somewhere "in between" fast and slow (A. Davis, Exhibit 2 at 29) but the collision stopped his leg while his body flipped over the post (*Id. at 30*).

*Injuries*

17. Andrew's collision with the post resulted in a severely displaced fracture of his right femur, requiring him to undergo two surgeries to install and remove stabilization hardware, and leaving him with a large scar on his right leg (Exhibit 17).

*Maintenance and Inspection Policies*

18. Inspection for hazards at Catamount is done by both the maintenance department and ski patrol. (Stickle, Exhibit 18 at 12-13; J. Gardner, Exhibit 4 at 18-19, B. Gardner, Exhibit 5 at 16-17; Schroeppel, Exhibit 7 at 29-30).

19. Robert Stickle, the maintenance director and the person in charge of grooming, stated "When I'm there, I'm always looking for hazards" (Exhibit 18 at 12), which he described as "anything out of the ordinary that might present an obstacle to a skier" (*Id. at 13*).

20. He said that when ski patrol finds something that "may be a problem" it is marked with an orange disk to alert skiers not to ski there (*Id. at 17*).

21. If a fence or a fence post is tilting over and it is reported to the maintenance department, it is the responsibility of the department to fix it (*Id. at 18-19*).

22. The leaning fence post in the area of Andrew's accident was never reported to the maintenance department (*Id. at 19*).

23. Judy and Bud Gardner, husband and wife ski patrol members were on duty on the date of the accident and both testified at depositions.

24. Judy Gardner stated that ski patrollers ride the lifts and ski all trails twice a day, "looking for things that may need to be marked from overnight grooming or weather conditions" (J. Gardner, Exhibit 4 at 18-19), and to "identify and mark" "obstacles on the trails" (*Id. at 23*). She defined obstacles to be marked as "conditions or things that may present a danger to the skier" (*Id. at 27*). She also stated that the maintenance department is responsible for routine maintenance of fencing (*Id. at 28,30*), and that patrollers are responsible for making sure orange fencing "is up as it should be" (*Id. at 28*).

25. Bud Gardner, the Ski Patrol director also agreed that the trails and lifts are inspected every day prior to opening, and that they are responsible for marking obstacles and hazards "with a fence or rope or poles, orange poles and orange disks" (B. Gardner Exhibit 5 at 10, 16-17). He further explained that trails are

checked for trees that had fallen down "and any other kinds of hazards that we might come across" that are not already marked (*Id.* at 16-17).

26. William Gilbert testified that it is Catamount's policy to mark all obstacles on trails that are under four feet in height and to mark any obstacles or dangerous conditions which are not open and obvious to a skier (Gilbert, Exhibit 9 at 62-65).

27. The fence post that Andrew struck supported orange mesh fencing and was put in by the maintenance department and maintained by the ski patrol (*Id.* at 37-38).

28. The accident site and fence post was easily visible from chairlift #3 which passed right over it (B. Gardner, Exhibit 5 at 24; Brousseau, Exhibit 6 at 22-23; Exhibit 29-view from chairlift 3).

29. The Ski Patrol Handbook notes that ski patrollers may typically be required to do various tasks including "identifying and marking obstacles" (Exhibit 11 at 53).

30. Richard Schroeppel, a member of Catamount's Ski Patrol, referring to deposition exhibit 35 (Exhibit 22), a photograph of the accident site and the leaning fence post, testified at deposition that "If I had seen it I probably would have [put something in front of the post to alert skiers], if I had seen it." (R. Schroeppel, Exhibit 7 at 30, 28-30).

*Notice of Defective Condition*

31. It is undisputed that Catamount had at least several days prior notice that the fence on the connector trail between Catamount and OnStage was leaning over. The General Manager William Gilbert testified that he had seen the fence leaning over but did nothing about it.

> "Q Okay, And after you saw it leaning over at an angle you didn't direct anybody to straighten it up, did you?
> Object to the Form
> A Did not rush to do it because there was no emergency to get it done" (Exhibit 9 at 79)

32. Mr. Gilbert said it was in that condition "Oh, probably just maybe four or five days" (*Id.* at 95). Robert Brousseau, another ski patroller, testified the fence post was leaning over prior to the accident, and it may have been that way for "more than a week" (Exhibit 6 at 22-23), and it was easily visible from chair lift #3 (*Id.*). Craig Davis, Andrew's father, believed he had seen the fence down for "weeks" prior to the accident (Exhibit 3 at 74).

*Location of Accident*

33. The location of the accident is a material disputed issue. Plaintiff contends that there is ample evidence that the leaning post was located within the confines of a trail, and that the obstacle was less than 6 feet in height (C. Davis Aff. ¶6).

34. Plaintiff's expert concluded Andrew was injured by colliding with an obstacle on a trail that should have been marked, padded (or constructed with flexible fencing material), and/or removed (Exhibit 19).

35. The photographs of the area taken the day after the accident show a level snowy area alongside an orange fence, with a fence post leaning over, and the bottom of the post jutting directly into and onto the area where skiers would pass between a bush and the fence (Exhibits 20-36). These photographs fairly depict the accident site on the day of the accident (Adams, Exhibit 8 at 31). See also Exhibit 37, taken the day of the accident.

36. It is evident from the photographs that skiers could pass between the bush and the fence located to the right side of the bush, particularly if the fence post were not jutting onto the trail (see e.g., Exhibits 21,22,23,26,29,33,35).

37. The Incident Report Form filled out by Judy Gardner of Catamount's Ski Patrol (Exhibit 12) has several boxes checked which support her understanding based upon discussion with on-site ski patrollers, that the accident occurred on a trail. First of all, the report states the accident occurred "on hill". After "Describe Specific Location" the following is hand written: "Connector from Catamount to OnStage @ top of slope." The difficulty level of the trail is listed as "most difficult [with a single diamond]" rather than "not applicable". A box marked "trail" is also marked rather than "other".

38. Ms. Gardner testified that if an accident occurs off of a trail that will be noted on the incident report (J. Gardner, Exhibit 4 at 33-34). No such notation appears on this report (*Id*. at 35). She also testified that had the accident occurred off of a trail, she would have checked the word "other" rather than "trail" on the Incident Report Form (*Id*. at 36).

39. Her husband, Bud Gardner, the Director of the Ski Patrol, described the location of the accident as "the connecter between Catamount and OnStage" (B. Gardner, Exhibit 5 at 9, 29).

40. Various ski patrollers testified that skiers regularly skied the Crossover Trail by passing to the right of the bush, between the bush and the fence in the very same area where Andrew was injured (Schroeppel, Exhibit 7 at 27; Adams, Exhibit 8 at

27-28; Brousseau, Exhibit 6 at 34-36).

41. Exhibit 16 shows an "x" where the head of the Racing Team saw Andrew lying in the snow as his chair passed over the accident site immediately after the accident (Adams, Exhibit 8 at 41-42).

42. Several witnesses, including Mr. Gilbert and several ski patrollers testified that if an area is "off limits" to skiers it would be blocked off with tape, rope or orange mesh fencing (J. Gardner, Exhibit 4 at 14,27, Adams, Exhibit 8 at 39). Steve Adams, the head of the racing clubs, stated he never saw the area between the bush and the fence on the crossover trail marked off limits by ropes, tape or fencing (*Id.* at 39).

43. Several witnesses placed an "X" on copies of Catamount Trail maps to show where they believed the accident took place. These marks appear to be on open trail or slope areas, and are not marked out of bounds on the map. (See Exhibit 15)

*The Defect Was Not "Open and Obvious"*

44. In describing how the accident occurred, Rick Schroeppel, a ski patroller responding to the scene of the accident stated that Andrew "caught the corner of the post" (Schroeppel Exhibit 7 at 13).

45. Plaintiff contends that the angled space between the leaning post and the snow was not an open and obvious tripping hazard (especially to a 7-year-old boy), and that the view of the obstruction was obscured both by the skiers in his class skiing in front of Andrew, and the bush. The photographic exhibits do not represent Andrew's view as he skied across the cross-over trail. Firstly, there were several skiers ahead of him in a line veering side to side as they practiced their railroad turning drill (Dennis, Exhibit 10 at 22-24). Thus, his main view would be of bodies zig-zagging in front of him (A. Davis, Exhibit 2 at 23-26).

46. Additionally, Andrew testified he was about 3 to 5 feet behind the skier in front of him. Thus, his line of sight would have been substantially filled by the back of this classmate that he had been following in the ordinary course of performing the drill. It appears that Andrew first saw the post as his leg came into contact with it (A. Davis, Exhibit 2 at 46).

47. Furthermore, there was some evidence presented during depositions that suggests Andrew's view of the fence post may have been obscured by the bush. Judy Gardner testified that Andrew told her he was skiing down the hill and turning around the bush, between the bush and the fence (J. Gardner, Exhibit 4 at 42-43). Approaching the post from that direction with skiers in front of you would mean

that it might only be seen after one turned around the bush, an instant before contact.

48. Although Andrew had seen the fence at least sometime during that current ski season (Exhibit 2 at 47) there is no evidence that he had ever seen the post leaning over in the week or two prior to his accident (*Id.* at 46).

*No Warnings of The Hazard Were Posted*

49. Judy Gardner and Bud Gardner conceded that no warnings regarding the defective fence post were on the slope prior to Andrew's accident (J. Gardner, Exhibit 4 at 31; B. Gardner, Exhibit 5 at 27).

50. Mr. Gilbert claimed that the orange poles and disks which were placed at the uphill corners of the fenced off area under the lift served as satisfactory warnings (Gilbert, Exhibit 9 at 77-78).

51. However, these orange disks were put up at the opening of the season (*Id.*) One disc was about 25-35 feet away from the post (and not necessarily in line with how skiers would approach it), and the other was a few feet behind the post (see Exhibits 20 to 36). It would hardly make sense to warn a skier about an obstacle after he collided with it, so the disk behind the post would be of little assistance.

52. Moreover, since Andrew had seen the fence with the orange disks before the fence post leaned over, these disks would offer no warning about the dangerous change in the condition of the fence since they were posted about 2 months prior to the accident, and long before the post changed position.

Respectfully Submitted,

Craig Davis, as parent of Andrew Davis, Plaintiff
by his attorney,

October 13, 2006

*/s/ Charles J. Ferris*
Charles J. Ferris
500 Main Street
Great Barrington, MA 01230
413 528-8900
413-528-9132 facsimile
BBO # 565630