UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                                )
CRAIG DAVIS, as parent and natural    )
guardian of ANDREW DAVIS,                 )    CIVIL ACTION
                               Plaintiff,       )    No. 05-30011-MAP
   -against-                                          )
                                                                )
CATAMOUNT DEVELOPMENT CORP.,   )
CATAMOUNT DEVELOPMENT CORP,    )
d/b/a CATAMOUNT SKI AREA,               )
                               Defendants.    )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION
TO STRIKE AFFIDAVIT OF CRAIG DAVIS**

Now comes Plaintiff Craig Davis o/b/o of Andrew Davis, and opposes the Motion To Strike the Affidavits of Craig Davis. In further opposition, Plaintiff states:

1. Craig Davis is the father of Andrew Davis, and was among the first people responding to Andrew's accident at the accident site on the date of the accident, while he was waiting for the ski patrol to arrive (C. Davis Dep. at 114-116) (attached).

2. While at the accident site he was able to make personal observations of the fence post, and of his son's position in the snow, and able to make reasonable conclusions based on observations about what had just happened.

3. The statement in Plaintiff's affidavit that Defendant objects to reads as follows:

> "5. Andrew told me that he had hit a 2" x 4" wooden post that I could see was on the trail, leaning over at about a 45 degree angle. It appeared that the top of his right ski had gone under the post, trapping his leg as he skied past." [Note the word "top" appears to be a typographic error; should read "tip"]

4. This statement reflects personal observations and mental conclusions of the affiant, including:

    (a) he could see a post on the trail;

    (b) the post was leaning over at about a 45 degree angle; and

    (c) it appeared that the tip of Andrew's right ski had gone under the post, trapping his leg as he skied past.

5. All of the foregoing statements are proper and would be admissible into evidence. A witness is competent to testify about "impressions of an individual's senses, directly received" Liacos, Handbook of Mass. Evidence, 5th ed. at 175.

6. The only portion of the statement in the affidavit which may be objectionable is "Andrew told me that he had hit a 2" x 4" wooden post." However, this statement is simply cumulative of other admissible evidence regarding how the accident took place. Andrew testified at deposition, that his right leg went under the post and he flipped over it (A. Davis at 30). The accident report (Exhibit 12) also contains admissible evidence that Andrew came into contact with a post on the crossover trail between Catamount and Onstage. One of the ski patrollers who responded to the accident scene testified at deposition that it appeared Andrew's ski tip was caught by the post (R. Schroeppel, Pl. Exh. 7 at 13). This was the shared opinion of two other ski patrollers who also responded to the scene (*Id.*). Mr. Davis could see the post on the trail at the accident site (C. Davis at 114-116).

7. Thus, there is no reason to strike the affidavit because it contains hearsay about what is universally agreed in this lawsuit - - that Andrew struck a post. That fact is not in dispute.

8. Defendant's suggestion that Craig Davis has no personal knowledge about this case is based on an out-of-context quote from his deposition transcript. When asked at deposition if Andrew had "lost control prior to coming into contact with the fence post?" Craig Davis said "I do not know. I only know what I've heard" (p. 79). That statement properly and honestly reflects the fact that Craig Davis did not see Andrew

skiing before he hit the post and therefore does not know if he was skiing in control. It most certainly does not mean that upon arriving at the site he did not see the location or position of the post, the location or position of his son, nor does it mean that he cannot formulate rational conclusions about the mechanism of the accident based upon his first-hand mental impressions. (see Pl. Exh. 16, showing Andrew's location in snow as testified to by the Race Team Director who passed over the site on a chairlift. Adams, Pl. Exh. 8 at 41-42).

9. The suggestion that Craig Davis's testimony as to the cause of the accident is inadmissible as mere speculation fails to account for the nature of circumstantial evidence, and the Rules of Evidence.

> "Almost all evidence is to some extent circumstantial. Testimony, for example, rarely asserts an ultimate fact; it usually asserts a fact (circumstance) from which the ultimate fact may be inferred" Liacos, *supra*, at 407.

10. A layperson can provide opinion or inference which is rationally based on the perception of the witness. Fed. R. Evid. 701. Here, Craig Davis saw his son lying in the snow on the trail next to and slightly ahead of an obstacle on the trail. He is competent to testify as to his inference as to what happened and how it happened. Defendant is free to attack the inference through cross examination, but it may not prohibit its introduction into evidence.

Wherefore, Defendant's Motion to Strike the Affidavit of Craig Davis should be denied or, in the alternative, the words "Andrew told me that" should be stricken from paragraph 5 of the affidavit and in all other respects it should remain as part of the record.

Respectfully Submitted,

Craig Davis, as parent of Andrew Davis, Plaintiff
by his attorney,

October 24, 2006

_____
Charles J. Ferris
500 Main Street
Great Barrington, MA 01230
413 528-8900
413-528-9132 facsimile
BBO # 565630

## CERTIFICATE OF SERVICE

On October 24, 2006 Plaintiff served the foregoing upon William L. Keville, Jr., Counsel for Defendant, electronically.

_____
Charles J. Ferris

### Page 113

```
 1  has moved on to the fourth grade year?
 2      A.  Yes.
 3      Q.  Have you discussed with Andrew what sports
 4  he plans to participate in this spring and summer
 5  moving forward after the ski season's over?
 6      A.  Spring and summer, no.
 7      Q.  I take it he's going to follow through and
 8  finish out the ski race year with the Bousquet
 9  people?
10      A.  That's the expectation, mm-hmm.
11      Q.  Do you have any family vacation planned
12  over the next three, six months?
13      A.  No.
14      Q.  I'll just check my notes.
15          Did Andrew injure any other parts of his
16  body besides fracturing his right femur?
17      A.  No.
18      Q.  And on that day was Andrew wearing a
19  helmet?
20      A.  Yes.
21      Q.  Does Andrew have any other hobbies or
22  activities besides those presently that we've
23  discussed?
24      A.  Typical nine-year-old.  I think we
```

### Page 114

```
 1  discussed everything.
 2          MR. KEVILLE:  I don't have any
 3  further questions for you.
 4          MR. FERRIS:  I may have some, I just
 5  want to talk to my client for a second.
 6              (A recess was taken)
 7
 8  CROSS EXAMINATION BY MR. FERRIS
 9      Q.  Mr. Davis, I believe you testified you were
10  present with Andrew from shortly after the accident
11  occurred until throughout his treatment during the
12  day?
13      A.  Correct.
14      Q.  And you were present when the ski
15  patrollers arrived?
16      A.  Correct.
17      Q.  And you were present when he was treated at
18  the ski patrol shack?
19      A.  Correct.
20      Q.  You were present when he was in both
21  ambulances?
22      A.  Correct.
23      Q.  And you were present when he was in both
24  emergency rooms, correct?
```

### Page 115

```
 1      A.  Correct.
 2      Q.  At any time during that period did you hear
 3  Andrew state to anyone that he lost control?
 4      A.  No.
 5      Q.  At any time during those periods that we've
 6  just discussed did you hear Andrew state that he went
 7  off the trail?
 8      A.  No.
 9      Q.  And were you close enough to Andrew at the
10  time he was being treated by the ski patrollers and
11  the EMTs to hear what Andrew was saying --
12          MR. KEVILLE:  Objection.
13      Q.  -- to the people giving him treatment?
14      A.  Yes.
15      Q.  And during none of those periods you heard
16  him state that he either went off the trail or lost
17  control, is that correct?
18          MR. KEVILLE:  Objection.
19      A.  Correct.
20      Q.  And did you ever hear him refer to anything
21  that he came into contact with as a two-by-six?
22      A.  I don't recall him saying that.
23      Q.  Right.
24      A.  He was in shock.
```

### Page 116

```
 1      Q.  Okay, just answer the question.
 2          MR. KEVILLE:  Motion to strike.
 3      Q.  (By Mr. Ferris)  Was it your appraisal of
 4  the situation that Andrew was in shock after the
 5  accident?
 6          MR. KEVILLE:  Objection.
 7      A.  Yes.
 8      Q.  Now, when you were at the scene of the
 9  accident did you see a board that was leaning onto
10  the trail?
11      A.  Yes.
12      Q.  Is that the board that -- is that one of
13  the boards shown on Exhibit 12-C?
14      A.  Yes.
15      Q.  And was that board located on the crossover
16  trail between On Stage and Catamount?
17          MR. KEVILLE:  Objection.
18      A.  Yes.
19      Q.  Was the board that you understand Andrew's
20  ski or leg came into contact with located on the
21  trail between -- on the crossover trail between On
22  Stage and Catamount?
23          MR. KEVILLE:  Objection.
24      A.  Yes.
```